KATE P. DUNGAN, Administratrix of ELIZABETH P. DUNGAN *vs.* THE MUTUAL BENEFIT LIFE INSURANCE COMPANY OF NEWARK, NEW JERSEY.

*Mortgage of policy of insurance—Equity of redemption—Tender—Payment of premium—Surrender of policy by the mortgagee—Notice to the assured of surrender, or sale, necessary—Rights in the policy, acquired by party purchasing or accepting a surrender, without such notice.—The Company affected by misstatements of its agent—Limitations—Lapse of time—Notice of claim as given by a previous unsuccessful action.*

A policy of insurance on the life of D. was issued by the Mutual Benefit Life Insurance Company, on the 17th of June, 1861, for the benefit of the wife of D. It was stipulated in the policy that in the event of non-payment of any premium on the day named for its payment, the policy with all previous payments thereon, and also all interest in profits should be forfeited to the company. At the time of issuing the policy W. was the agent of the company in Baltimore, and through him the policy was obtained. For the purpose of paying the cash part of the premium due on the 17th of June, 1862, W. loaned D. and wife the money, and took their note for it at four months. The cash part of the premium was then paid, and a note given for the residue; and this was the last premium that was ever paid by either D. or his wife. At the time of taking the note for the money loaned, W. took an assignment of the policy under the hands and seals of D. and his wife, and at the same time executed to them a receipt and defeasance, by which it was stated that said assignment was received *"as security for the prompt payment at the maturity of their note,"* (describing it,) "said assignment to be null and void upon the payment of said note at its maturity, otherwise to continue for the sole use and benefit of W." These papers all bore date the 17th of June, 1862. The note given to W. not being paid at maturity or afterwards, the policy was not redeemed. W. as assignee paid the premiums as they fell due in 1863, 1864 and 1865; and on the 28th of November, 1865, he surrendered the policy to the company, and received

for it its reserve value. D's wife died in August, 1868, and D. himself died in April, 1870. The former died intestate, and letters of administration upon her estate were not taken out till December, 1871. D. and wife sued the company in trover for the conversion of the policy, but failed in the action, which was not finally determined till the year 1873. On a bill in equity, filed immediately afterwards by the administratrix of Mrs. D. against the company, seeking not only to redeem the policy, but to recover the amount thereof less the amount of unpaid premiums and interest due the company, and the amount of the note with interest due W., together with the premiums paid by him while he held the policy as assignee, it was HELD:

1st. That any agreement in the assignment or in the defeasance, showing that the parties intended the assignment to operate as a security for the repayment of money, was all that was necessary to make it a mortgage, and such an agreement was plainly apparent on the face of the defeasance.

2nd. That when once ascertained that the assignment was to be considered and treated as a mortgage, then all the consequences appertaining in equity to a mortgage must be strictly observed, and the right of redemption is regarded as an inseparable incident.

3rd. That notwithstanding the express terms of the defeasance, that in default of payment of the note at maturity, the policy was to continue for the sole use of the mortgagee, the right of redemption was not thereby defeated after the day of payment.

4th. That in order to entitle the complainant to maintain her claim in this case, it was necessary for her to show by satisfactory evidence, that the assured, while it was admitted she did not pay the premiums, tendered payment of them as they became due.

5th. That an alleged tender of the premium due in June, 1863, even if made would not have restored the policy, no tender having been made to W. of the mortgage debt due to him then or at any subsequent time.

6th. That W. having paid the premium due in June, 1863, and continued to pay the premium in 1864 and 1865, and thus kept the policy alive, subject to the right of redemption, upon payment of the mortgage debt and the premiums advanced for the preservation of the security, and there having been no tender of the mortgage debt to him at that time or at any subsequent time, it was immaterial whether an alleged tender of the premium due in June, 1873, was in fact made or not. As if the premium then due had been paid by the assured, it would only have relieved W. from the necessity of advancing the premium, and not in any manner restored the policy to the control of the assured.

Dungan, Adm'x *vs.* Mutual Benefit Life Ins. Co.

After the alleged tender in June, 1863, no further steps were taken by the assured in reference to the policy until September, 1865, when inquiry at the home office of the defendant, was made by the assured, in regard to what had been done with the policy. At that time the policy was still alive, and would so continue till June 17th, 1866, and the assured was so informed by the officers of the defendant    A correspondence then ensued between the attorneys of the assured and the president of the defendant, in reference to the claim and demand of W.  On the 12th of December, 1865, the president communicated the fact that the policy had been surrendered by W., the surrender having been made on the 28th of November, 1865.  During this correspondence, there was no tender or offer to pay the amount claimed, or the amount actually due by W. on account of the note and money advanced for premiums.  It was testified by a witness that, in May, 1866, he went to the office of the defendants in Newark, and there saw the vice-president of the company, and told him he had come prepared to pay the amount the company had named to the attorneys, as that which W. would be willing to receive and re-transfer the policy; and was then informed that the policy had been surrendered and ended.  He stated that he had not the money with him, but had made arrangements for it, and would have got it in New York and sent it on from Baltimore.  HELD :

That this transaction did not amount to a tender.

After this occasion there was no other attempt to make tender either of the premiums or of the amount due W.  HELD :

1st. That as the punctual payment of the premiums was an essential condition to the life of the policy, and the question whether the policy should be kept in force or allowed to lapse, being entirely at the option of the assured or her assignee, the claim to redeem and enforce the policy as if in force at the death of the life insured, could not be sustained.

2nd. That W. holding the policy as mortgagee, held it subject to the right of redemption, provided the right was exercised within a reasonable time.

3rd. That W. could only sell the policy after giving due notice to the assured to redeem, and while it was competent to surrender the policy to the company either for its reserve or equitable value, as an advantageous mode of sale and foreclosure, yet it was necessary that notice should have been given ·to redeem before the surrender took place.

4th. That the party purchasing or the company accepting the surrender without such notice, would only acquire the interest of the mortgagee, and hold subject to the right of redemption as the mortgagee held before the sale or surrender.

Dungan, Adm'x *vs.* Mutual Benefit Life Ins. Co.

5th. That the company was affected by any misstatements made by W. in regard to the policy before its surrender.

6th. That the utmost candor and good faith were required in the matter, not less on the part of the company, its officers and agents, than the assured; and not only in the inception of the contract, but in all subsequent dealings in respect to it.

7th. That under the circumstances of the case, there appearing to have been a want of good faith on the part of the company and W., it was but just to declare that the right of redemption continued to exist at the time of the surrender of the policy; and that the surrender should be regarded as having been made on the joint account of W. and the assured, according to their respective interests; that is to say: on account of W. to the extent of the interest secured by the assignment of the policy, including premiums paid, and on account of the assured for the residue of the reserve value which the company agreed to allow W.

8th. That the Statute of Limitations had no application to a case like this.

9th. That as to the lapse of time the circumstances of the case afford full explanation of that; as Mrs. D. was a *féme covert* from the date of the policy to the time of her death in 1868, and Mr. D. her husband, was for several years immediately preceding his death in 1870, mentally unable to attend to business, and there having been no acquiescence in the claim of of either W. or the company in respect to the policy.

10th. That an action of trover brought by D. and wife in 1866, against the company for the alleged tortious conversion of the policy, and not finally determined until 1873, although said action was misconceived, was notice to the company of the adverse claim of the assured.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before STEWART, GRASON, MILLER, ALVEY and ROBINSON, J.

*Arthur Geo. Brown* and *Frederick W. Brune,* for the appellant.

There never was a legal foreclosure of the equity of redemption in the mortgaged property, nor such a sale as

divested the mortgagor of her right to redeem. 1 *Code,* *Art.* 64, *sections* 1, 5, 6, 7, 8, 9, 10, 11, 12, 13 ; *Schouler's* *Pers. Prop.,* 554, 5, 6, 7, 8; *Clark vs. Levering,* 1 *Md. Ch.,* 178, 9 ; *Sheckell vs. Hopkins,* 2 *Md. Ch.,* 89 ; *Dougherty vs. McColgan,* 6 *G. & J.,* 275 ; *Pratt vs. Van-* *wyck's Ex'rs,* 6 *G. & J.,* 495 ; *Farrell vs. Bean,* 10 *Md.,* 217 ; *Walker vs. Stone,* 20 *Md.,* 195 ; *Korns vs. Shaffer,* 27 *Md.,* 83 ; *Hinkley vs. Wheelwright,* 29 *Md.,* 341; *Baugher vs. Merryman,* 32 *Md.,* 185, 189 ; *Conway vs.* *Alexander,* 7 *Cranch,* 218 ; *Nesbitt vs. Berridge,* 32 *Beaven,* 282, 289; *Same Case on Appeal,* 4 *DeGex, Jones & Smith,* 45, 48, 49 ; *Bird vs. Davis,* 1 *McCarter,* (*N. J.,*) 474, 5 ; *Wilson vs. Brannon,* 27 *Cal.,* 258 ; *Freeman vs. Freeman,* 2 *C. E. Green,* (*N. J.,*) 45, 47, 48; *Van Brunt vs. Waka-* *lee,* 11 *Mich.,* 177, 181 ; *Franders vs. Chamberlain,* 24 *Mich.,* 305 ; *Stoddard vs. Dennison,* 7 *Abb. Pr. Rep.,* (*N. S.,*) 309 ; *Hinman vs. Judson,* 13 *Barb.,* 629 ; *Terrell vs.* *Allison,* 21 *Wall.,* 289, 292, 293.

The false statements made by Webb to Henry Dungan, in June, 1863, at the office of the company, in the line of its business, when Henry called to pay the premiums on his father's policy, and subsequently to Lipscomb, the company was responsible for. *Ins. Co. vs. Wilkinson,* 13 *Wall.,* 222, 234, 5, 6; *Ins. Co. vs. Mahone,* 21 *Wall.,* 152, 156.

To permit appellee to rely now (as it does in its answer) upon the fact that after June, 1862, the Dungans did not themselves pay the premiums, but that they were paid by Webb in their name, would be allowing appellee to take advantage of its own wrong.

It is to be remarked that, although Webb, when examined, denied some of the facts testified to by Henry Dungan, he denied none of Lipscomb's testimony, nor even referred to it.

This is equivalent to an admission by Webb of its truthfulness.

Lipscomb testifies that Webb, in September, 1863, assured him that the policy was dead and surrendered to the company.

That statement was absolutely false.

But, in fact, the premiums due June 17th, 1863, 1864, and 1865 were regularly paid to appellee as required by the contract contained in the policy, and on September 20th, 1865, the president of appellee wrote to Holmes, "Mr. Francis D. Dungan is insured in this company."

At that time the policy was a valid, subsisting contract, and the premium had been fully paid, which was, according to the terms of the contract, to keep it *alive* (for the benefit of all parties interested) *until June 17th,* 1866.

Appellee itself proves that Webb intended to keep on paying the premiums until Francis Dungan's death, for his own selfish purposes it is true, but legally and really for the benefit of the Dungans as well, who, by proper proceedings, and by tendering what was due, could have set up their equity of redemption.

The president of appellee himself, and Webb, both testify that Grover, the president, persuaded Webb not to keep up the policy, but to surrender it to the company. Grover using as an argument with Webb, to induce him to surrender the policy, the fact that if Francis Dungan died while the policy was still in force, his family would get the insurance money, less what Webb had paid for premiums to keep it alive.

Thus, by a conspiracy between the appellee and its agent in Baltimore, they tried to deprive the Dungans of the insurance money, and appellant in this action seeks only to put herself in the exact position where she would have been but for appellee. Such dealings are contrary to public policy and as against appellant, void. She cannot be prejudiced by them.

Quite irrespective of the prospective value which the policy had, looking to the time of Francis Dungan's

death, the actual cash value of the policy in November, 1865, when Webb "surrendered" it to the appellee, was very considerable.

The sum then due to Webb under his mortgage was about $754.61.

The sum paid November 28th, 1865, by appellee to Webb, as its actual value in cash at that time, clear of Dungan's premium notes, and of all claims of the company, was............................................................ $1,248 51

        Deduct............................................... 754 61

        The difference....................... $493 90

represents the profit of Webb, and gives some criterion for estimating the value of the equity of redemption, quite clear of and in addition to the more valuable *right* to keep the policy alive until Francis Dungan's death.

For the equity of redemption nothing was paid. See *Baugher vs. Merryman*, 32 *Md.*, 193, 194.

The transfer or "surrender" of the policy from Webb to appellee was not in any proper or legal sense a *sale* to a *bona fide* purchaser. It was a mere transfer of the mortgagee's claim to a party having full knowledge of the condition of the title.

It was not made after due demand and notice for the purpose of foreclosure—or of surrender—which, in this case, would have been equivalent to a foreclosure, as nothing was due, as between the insurer and the assured, at the time of the transfer.

It was a purchase by one who was in effect a *trustee* (as appellee in fact admits itself to have been), at a forced sale from its *cestui que trust*, to its advantage and her disadvantage. *Mason vs. Martin*, 4 *Md.*, 135; *Pairo vs. Vickery*, 37 *Md.*, 468, 484, 5.

It was also contrary to public policy and good morals.

Appellant, on the above point, relies on the authorities previously cited and also on *Md. Fire Ins. Co. vs. Dal-*

*rymple*, 25 *Md.*, 265, 6, 7 ; *Balto. Mar. Ins. Co. vs. Same, Ibid, p.* 302 ; *Korns vs. Shaffer*, 27 *Md.*, 83 ; *Keighler vs. Savage Manf. Co.*, 12 *Md.*, 416–17 ; *Hoffman Steam Coal Co. vs. Cumberland, &c., Co.*, 16 *Md.*, 506–9 ; *Cumberland, &c., Co. vs. Sherman*, 20 *Md.*, 127 ; *Same vs. Parish*, 42 *Md.*, 598, 606, 607, 613, 614.

Appellee took the policy with full knowledge of the Dungans' title and claim to the equity of redemption, and of their desire and efforts to redeem it ; and, having accepted the alleged surrender " with its eyes open, and having full knowledge, must be considered as standing in Webb's shoes ; " (Opinion of Judge PINKNEY.) *Central Bank vs. Copeland*, 18 *Md.*, 305, 317 ; *Timms vs. Shannon*, 19 *Md.*, 297, 314 ; *Green vs. Early*, 39 *Md.*, 223, 230 ; *Johnston vs. Phœnix Ins. Co.*, 39 *Md.*, 233, 240, 242 ; *Walker vs. Stone*, 20 *Md.*, 195, 197, 202.

Indeed, the forfeiture was attempted and carried out at the express instance and solicitation of the appellee, as has been already shown.

It is true that Grover, in his cross-examination, hypocritically pretends that he persuaded Webb to surrender the policy, because " it would not be right" to keep it alive until Dungan's death.

Why it would not have been right is not apparent, and Grover fails, when specially interrogated, to throw any light on that subject.

Although so tender upon that point, Grover seems to have no qualms of conscience about making, by this nefarious transaction, a handsome profit for his company and its agent Webb ; paying over to him the premiums which had been paid on the policy since 1852, and getting rid (as he hoped) of all responsibility under the contract of insurance.

In fact *appellee made itself trustee for Mrs. Dungan, and assignee of the mortgage.*

As mortgagee, Webb had no interest in the policy, beyond his debt and the premiums paid by him, with interest; (*Burridge vs. Row*, 1 *Y. & Coll. New Rep.*, 183; 191; *same case on appeal*, 13 *L. J.*, *ch.* 176; *Bunyon on Life Ins.*, *foot p.* 95, *marg.*;) and the assignment having been made without the concurrence of the mortgagor, the appellee, as assignee, took "the mortgage and the debt secured by it, upon the same terms and subject to the like equities and defences that it was subject to in the hands of the assignor. The mortgagor cannot be prejudiced by the assignment." *Cumberland Coal Co. vs. Parish*, 42 *Md.*, 614; *Whitridge vs. Barry*, 42 *Md.*, 151.

Webb, therefore, had held the policy for the benefit of himself and Mrs. Dungan in their respective capacities and rights of mortgagee and mortgagor; and if, during that time, Francis Dungan had died, there can be no doubt that it would have been not only the right, but the duty of Webb to recover the insurance money for the benefit of the mortgagor as well as for himself.

Appellee, by assignment from Webb, stepped into his shoes, and in view of the facts and the authorities cited, thereby was subjected to and assumed all the duties which Webb had owed to the mortgagor of the policy, as the necessary consequence of its acquisition of his rights as mortgagee.

And the relation of mortgagor and mortgagee was not destroyed, by the so-called "surrender" in November, 1865; which being fraudulent and inoperative to destroy the policy, as decided by the Court below, and already shown, while it extinguished the rights of Webb, did not affect those of the other parties.

Appellee by its letter of December 12th, 1865, refused to have anything further to do with the matter, but, as an extra precaution, Henry Dungan went to Newark in May, 1866, before the next annual premium fell due, to pay all that appellee had demanded and falsely alleged to be due.

This, appellee refused to take.

Appellant was, therefore, relieved from the duty of making any further payments or tenders, and indeed deprived of all opportunity to make them.

The reply of appellee's vice-president made Henry Dungan's offer and statement equivalent to a formal tender, and was a waiver of subsequent tenders. *Bull vs. Schuberth*, 2 *Md.*, 60 ; *Buell vs. Pumphrey*, 2 *Md.*, 261 ; *Parker Vein Co. vs. O'Hern*, 8 *Md.*, 201 ; *Tacey vs. Irwin*, 18 *Wall.*, 549, 550, 551 ; *Bennett vs. Hunter*, 9 *Wall.*, 326, 338 ; *Hampton vs. Rouse*, 22 *Wall.*, 263, 274 ; *N. Y. Life Ins. Co., vs. Cloptin*, 7 *Bush*, (*Ky.*,) 149 ; *Hillyard vs. Mut. Ben. Life Ins. Co.*, 35 *N. J. Law*, 424 ; *Hamilton vs. Mut. Life Ins. Co.*, 9 *Blatch. C. C.*, 256-7, 259 ; *Md. Fire Ins. Co. vs. Gusdorf*, 43 *Md.*, 507, 513.

We have now, however, to consider the effect of the non-payment of premiums on and after June 17th, 1866 ; and on that point appellant is now first compelled to differ from the learned Judge below.

Appellant in her bill relied on the offer to pay all that appellee had demanded, which Henry G. Dungan testifies that he made in May, 1866 ; and on appellee's express refusal to receive that or any other sum, *on the ground that "the policy had ended, it having been surrendered,"* and the further declaration made at the same time by the vice-president, who was the officer in charge, that "the company had nothing further to do with the matter ; that the policy had been surrendered, and the value paid to Mr. Webb, the assignee."

In the same connection she should have relied also on the still stronger and more conclusive evidence on that point furnished by the letters of appellee's president, and especially on his letter, dated December 12th, 1865, in which, speaking on behalf of appellee, and writing to Mrs. Dungan's counsel, about this very policy, he says, "Mr. Webb, the assignee of the policy about which you write,

having surrendered to the company the policy, and we having paid the equitable value to him therefor, we suppose *we have no further connection with the subject."*

The learned Judge of the Circuit Court in forming his opinion, seems to have lost sight of this very important letter, and does not refer to it.

It was a distinct and formal statement, that the company repudiated any obligation to, or contract or connection with the Dungans, that the policy had been "surrendered" to and purchased and paid for by appellee, and that it was the company's exclusive property.

This letter should be read in connection with that to which it was a reply in which Mrs. Dungan's counsel say: "We deem it proper to notify you, that as your agent here refuses any settlement with our client, we shall sue your company at the next term of Court," and also in connection with Webb's declaration to Lipscomb, that "there were no conceivable circumstances under which he would give up the policy."

Any tenders or offers to pay which were or could have been made thereafter, were and would have been works of supererogation. It would have been worse than idle—in law unnecessary, and in fact absurd—to continue to pay premiums on a policy which the insurer had declared in the most formal way had ceased to exist, and after it had refused to perform its duty under the contract contained in the policy, or to recognize any rights whatsoever, present or prospective, in the assured; particularly in view of the important fact, that the policy itself was in the hands of the appellee, and the legal title to it was vested in the company under the assignment from Webb—(38 *Md.,* 242.)

It will not do for appellee now to contend that, *because* (in consequence, as has been already shown, of its own absolute and wrongful refusal to receive premiums or to continue the contract,) no premiums were, after a certain

time, tendered or paid, *therefore* the policy and all the rights of the assured under it, ceased to exist.

And yet that is in effect what appellee does contend for. *Parker Vein Co. vs. O'Hern,* 8 *Md.,* 201; *Manhattan Ins. Co. vs. Warwick,* 20 *Gratt.,* 620–1; *Williams vs. Bank of U. S.,* 2 *Pet.,* 102; *Leslie vs. Knickerbocker Life Ins. Co.,* 2 *Hun.,* (*N. Y.,*) 616, 619; *Hamilton vs. Mut. Life Ins. Co.,* 9 *Blatch. C. C.,* 257.

None of the authorities cited by the learned Judge below, or by the counsel for appellee in argument, are cases in which there was a failure to pay premiums in consequence of the fault of the insurer, or its refusal to receive them, or its waiver of tender of them.

An examination will show that they are each and all, cases in which the failure arose from the fault or misfortune of the assured. And appellant confidently believes that no case can be found in which the Courts have allowed an insurance company to take advantage of its own wrong, as appellee seeks to do in this case. *Hamilton vs. Mut. Life Ins. Co.,* 9 *Blatch.,* 259.

As to the defence of limitations, the appellee's undertaking in the policy, was to pay $5000 to "Elizabeth W. Dungan, or assigns, within ninety days after due notice and proof of the death of the said Francis D. Dungan." The notice was given and proof furnished through Mr. Lipscomb. Francis D. Dungan died April 22d, 1870, in the Insane Asylum at West Philadelphia. Until an administrator was appointed on the estate of Elizabeth Dungan, (who died August 14th, 1868, intestate and childless,) limitations did not begin to run. *Haslet vs. Glenn,* 7 *H. & J.,* 17, 24; *Angell on Limitations,* 54, 55.

Complainant was appointed administratrix in December, 1871, and the bill of complaint was filed in this case November 10th, 1873.

In answer to the suggestion of appellee in its answer, and of the Court below, that Dungan and wife *might,* if

they had been so advised, or had seen fit to do so, have filed a bill to redeem, during their joint lives, and that, because they did not, either limitations or laches may be a bar, appellant replies, as to *limitations*, that during the whole time indicated, Elizabeth Dungan was a *"féme covert,"* and as such, protected by 1 *Code, Art.* 57, *Sec.* 2 ; that she died under coverture, and that, as her husband did not and could not (both because from the time of his wife's death in 1868, until his own death in 1870, he was a helpless lunatic, confined in an insane asylum, and because the policy was in the hands of the appellee,) reduce the policy of insurance into possession during his life-time, (*Knight vs. Brawner*, 14 *Md.*, 1, 7,) it devolved upon her administratrix, this appellant, (*Stockett vs. Bird*, 18 *Md.*, 484, 488–9, and *Code* 1, *Art.* 93, *sec.* 32,) who was appointed in 1871, and filed her bill in 1873. 2 *Story's Eq. Juris.*, sec. 1028 *a; Barroll's Ch. Pr.*, 417.

As to the suggested *laches* of Mrs. Dungan, appellant replies in the language of this Court, (14 *Md., foot p.* 7 :) " Being under disability, no laches can be imputed to her," and after the death of Mrs. Dungan certainly no laches could be imputed until an administrator was appointed. *Haslett vs. Glenn*, 7 *H. & J.*, 17, 24, and other authorities cited above.

And in view of the facts of this case, appellant especially relies upon *Pairo vs. Vickery*, 37 *Md.*, 468, 484–5, and the unreported decision of the Court of Appeals of New York, in the case of *McMurray, et al. vs. McMurray*, 66 *N. Y.*, 175.

The cross-examination of Webb and Grover, under the Baltimore and Newark commissions, shows their great want of frankness in disclosing to the Court the facts of this case, and their correspondence in relation thereto, and, in connection with the facts actually proved, gives appellant the right to argue that there has been a deliberate suppression of important evidence by appellee and its said

agents. *Mut. Ben. Life Ins. Co. vs. Hillyard*, 37 *N. Y. Law*, 444, 461, 470, 474 ; *Cohen vs. N. Y. Mut. Life Ins. Co.*, 50 *N. Y.*, 610, 620, 624 ; *Sands vs. N. Y. Life Ins. Co.*, 50 *N. Y.*, 626 ; *Martine vs. Int. Life Ins. Soc.*, 53 *N. Y.*, 339, 344 ; *Manhattan Life Ins. Co. vs. Warwick*, 20 *Gratt.*, 614, 620, 621 ; *Mut. Ben. Life Ins. Co. vs. Atwood*, 24 *Gratt.*, 497 ; *N. Y. Life Ins. Co. vs. Hendren*, 24 *Gratt.*, 536 ; *Statham vs. N. Y. Life Ins. Co.*, 45 *Miss.*, 581.

*T. W. Hall* and *I. Nevett Steele*, for the appellee.

The legality and validity of the transactions between Webb and the Dungans, and between Webb and the company, are no longer open to question, having been already passed upon and affirmed by this Court. They are, in fact, *unimpeachable* upon any grounds. There is no dispute that the Dungans owed Webb money ; that they assigned the policy to Webb, and that, as such assignee, Webb, as he had a legal right to do, surrendered it to the company. All this this Court has decided. (38 *Md.*, 242–255.) In passing upon the effect of the assignment of June 17th, 1862, this Court say (38 *Md.*, 251,) that it was *either* a mortgage or a conditional sale—it not being material to the purposes of the former case to determine which. It is only upon the theory that the assignment and receipt of June 17th, 1862, taken together, constituted a *mortgage* of the policy, that the appellant has any showing or standing in Court. If it was a *conditional sale*, there is an end of the case, since this Court has expressly said that after default made, the title of Webb would, in that event, be " absolute and irrevocable, *both at law and in equity.*" (38 *Md.*, 251.) Treating it as a mortgage, however, the right to surrender the policy equally passed to Webb as an incident to the assignment, necessary, in fact, to give to the assignment of such an investment any value as a security, and thereby distinguishing it from a mere case of bailment or pledge. (38 *Md.*, 253–4.) *Palmer vs. Merrill*, 6 *Cush.*, 282.

Webb was the agent of the company, and "public policy" prohibits any such dealings as in this case between policy-holders and companies or their agents. If there were anything in this argument, the Court would have considered it in the former case. The transaction, however, between Webb and the Dungans was a purely personal and private one, and not in his capacity of agent, and with which the company had nothing to do. It is not true that the company lent Webb the money which he loaned the Dungans, or that he was the agent of the company in making said loan. The company *some time afterwards* lent Webb some money upon a number of collaterals, of which this policy, then the property of Webb, happened to be one, and which loan Webb subsequently repaid, receiving back his collaterals, including this policy. Webb was the agent of the company only for the purpose of receiving applications for insurance and payment of premiums. His statements and conversations in reference to. his private transactions with the Dungans, therefore, do not concern the company any more than the transactions themselves. The company cannot be affected by representations of its agent in regard to matters outside of the scope of his agency. This rules out all conversations between Webb and H. S. Dungan or Lipscomb in regard to his (Webb's) relation to the policy—which are the subject of appellee's exception in the Court below.

It is further argued, and this seems to be the gist of the appellant's case, that in the interval between June 17th, 1862, and the date of the surrender of the policy, Webb made false and contradictory statements in reference to the policy. This Webb denies. The fact, however, is wholly immaterial. Webb's conversations and statements, made with reference to his own private transactions with the Dungans, can in no way affect the company, and if made with reference to the condition of the policy, or other matters within the scope of his agency, the Dungans, as

shown by the testimony of H. G. Dungan and Lipscomb, his attorney, were in no way misled or damnified by them. They did not trust Webb, and they were fully and truthfully informed at the company's office at Newark, and by its highest officer, of all matters relating to the policy. Besides, they knew all along of their own knowledge : 1st, That the policy was legally Webb's, having been assigned to him for a debt; 2d, That Webb had never been repaid his debt, principal or interest ; 3d, That for several years they had paid no premiums, and that if the policy was alive, it was kept alive by further advances on Webb's part ; 4th, and lastly, They knew, as already stated, upon the best authority (that of the company's books and president, at Newark,) that the policy was in force. It would seem impossible for the most fertile fancy to distort these facts into a case of fraud or concealment against the company.

The present proceeding is a *bill to redeem,* AND *to recover the amount of the policy!* Webb, as the assignee of the policy, was under no obligation to pay premiums, or to keep the policy alive for a single year. He had a perfect right, if he pleased, to let it lapse and become forfeited, by non-payment of premiums, and so let it expire on his hands, or he had, as incidental to his legal rights and ownership, as assignee, the right to surrender it to the company, and so re-imburse himself for his advances. The Dungans, when they assigned the policy to Webb, took the risk therefore, 1st, of his letting it die, (if they did not pay the premiums;) 2nd, of his surrendering it. If they wished to redeem, it was incumbent upon them to exercise their right to do so, "within a reasonable time," "with due diligence," and before either of these contingencies, fatal to the further existence of the policy, should happen. The Dungans assigned June 17th, 1862. Default was made in the payment of the note for which it was assigned in October, 1862. The right to redeem, is

for the first time asserted in the present proceedings, by bill filed November 10th, 1873, by the administratrix of Mrs. Dungan, eight years after the surrender of the policy, and after both the Dungans were dead. It comes too late. Such an exercise of the right to redeem is barred, if not by Statute of Limitations, by lapse of time. *Wilhelm vs. Caylor*, 32 *Md.*, 152 ; *Angell on Limitations, secs.* 26, 27 ; 2 *Story Eq. Juris., sec.* 1520 ; see also *Ib., sec.* 1031 ; *Penny vs. Brice*, 18 *C. B. N. S.*, 396–7, (114 *E. C. L.;*) *Harwood vs. R. R. Co.*, 17 *Wall.*, 81 ; *Marsh vs. Whitmore*, 21 *Wall.*, 185 ; *Wilson vs. Brannon*, 27 *Calif.*, 258, 270.

Not only was no offer to redeem made, nor any right to redeem set up by the Dungans in their life-time, but in 1866, by the institution of an action of trover against the company, they made election of a totally *different and inconsistent* remedy, thereby waiving all claim or pretence to any subsequent right to redeem, or any purpose to do so. This ought to be sufficient to preclude the appellant's present proceeding. *Blackett vs. Bates*, 1 *L. R. Chy. App.*, 117–126, and cases *ut supra*.

Even if the surrender and cancellation of the policy in November, 1865, after notice and with full knowledge on the part of the Dungans, did not put an end to the policy so far as they and their rights were concerned, and if the Court should hold that the company took the surrender, subject to the same equities, whatever they might be, which the Dungans had while the policy continued in the possession of Webb, still, to keep the policy alive until the death of F. D. Dungan, in 1870, *payment or tender of premiums by somebody* was necessary. Webb paid the premiums in 1863, 1864, 1865. Francis D. Dungan did not die until 1870. No premiums were paid or tendered by anybody after June 17th, 1865. The policy, therefore, lapsed and ceased to exist after June 17th, 1866, according to its terms and conditions, by reason of such non-pay-

ment, and with it all interest of the Dungans therein fell to
the ground.    The administratrix of Mrs. Dungan cannot
maintain a bill to *redeem* what had no existence as prop-
erty in the life-time of her intestate, and in which her
intestate had ceased to have any interest years before her
death.    Nor can this Court presume in favor of the admin-
istratrix, that her intestate would have been able or willing
to pay premiums from 1866 to 1870.    To pay or not to pay
was the election of the living.    It cannot be claimed by
the administratrix after her death.    *Want vs. Blunt,* 12
*East,* 183 ; *Simpson vs. Accidental Death Ins. Co* , 2 *C. B.*
*N. S.,* 257, (89 *E. C. L. ;*) *Pitchard vs. Merchants' Mutual*
*L. I. Co.,* 3 *C. B. N. S.,* 662, (91 *E. C. L.;*) *Acey vs.*
*Fernie,* 7 *Mees. & Welsby,* 151 ; *Busby vs. North America*
*L. I. Co.,* 40 *Md.,* 572, 582-3 ; *Mutual Benefit Life Ins.*
*Co. vs. French,* 4 *Bigelow,* 373 ; *Mutual Benefit Life Ins.*
*Co. vs. Jarvis,* 22 *Conn.,* 133 ; *Williams vs. Washington*
*L. I. Co.,* 4 *Bigelow,* 57 ; *S. C.,* 31 *Iowa,* 544 ; *Howell vs.*
*Knickerbocker Life Ins. Co.,* 1 *Bigelow,* 580 ; *S. C.,* 44 *N.*
*Y.,* 276 ; *Ruse vs. Mutual Benefit Life Ins. Co.,* 23 *N. Y.,*
516 ; *Mutual Benefit Life L. I. Co. vs. Ruse,* 1 *Bigelow,* 83,
*and note ; S. C.,* 8 *Georgia,* 534 ; *Roberts vs. N. E. Mut.*
*Life Ins. Co.,* 2 *Bigelow,* 143, 147 ; 2 *Disney,* 106 ; *Robert*
*vs. N. E. Mut. Life Ins. Co.,* 1 *Bigelow,* 640 ; 1 *Disney,*
355 ; *Pitt vs. Berkshire Life Ins. Co.,* 100 *Mass.,* 500 ;
*Nightingale vs. State Mut. Life Ins. Co.,* 5 *R. I.,* 38 ;
*Dillard vs. Manhattan Ins. Co.,* 44 *Geo.,* 119 ; *Tait vs.*
*N. Y. Life Ins. Co.,* 4 *Bigelow,* 479, 484-5-6-7.

There is nothing in the visit of inquiry paid by H. G.
Dungan to the company's office, in May, 1866, to militate
against the application of this rule.    It was a visit of
inquiry solely.    There was no tender in fact, and no pre-
tence of present ability or readiness to make tender.    None
of the cases, which decide that under some circumstances,
the necessity for *actual* tender may be dispensed with, go
so far as to say that *the ability and readiness to make*

*tender,* as well as the fact of tender itself, may be dispensed with. Neither would tender of any amount *then due,* (May, 1866,) have covered the case of premiums yet to accrue for the next three years. Yet, without payment or tender of such premiums, already stated, the policy ceased to exist. 5 *Robinson Pr.,* 943–4; *Glasscott vs. Day,* 5 *Esp.,* 48; *Kraus vs. Arnold,* 7 *J. B. Moore,* 59, (17 *E. C. L.,* 71;) *Lewis vs. Mott,* 9 *Tiffany,* 396–402; *Bakeman vs. Pooler,* 15 *Wend.,* 637.

ALVEY, J., delivered the opinion of the Court.

We have had this controversy before us on a former occasion. It was then in the form of an action of trover for the alleged conversion of the policy of insurance, 38 *Md.,* 242. That action resulted adversely to the plaintiff; and immediately upon the decision of that case, the present bill was filed.

In the former case, this Court decided that the assignment of the policy by Dungan and wife to Webb was not a pledge, and that, consequently, they had not at the time of the alleged conversion and suit brought, the interest and title of bailors, so as to enable them to maintain an action of trover for the conversion of the policy. We expressly refrained, however, from intimating any opinion as to the rights and liabilities of the parties in a different form of action or proceeding.

The policy of insurance on the life of Francis D. Dungan was issued by the defendants on the 17th of June, 1861, to and for the benefit of Mrs. Elizabeth W. Dungan, the wife of the said Francis D., for the sum of $5,000; and which policy contains an express agreement on the part of the defendants that, in consideration of the representations made in the application, and of the sum of $245 to them paid by the assured, and of the like sum to be annually paid on the particular day mentioned, during the continuance of the policy, they would well and truly pay or cause to be

paid, "the said sum insured to the said Elizabeth W. Dungan, or *assigns*, within ninety days after due notice and proof of the death of the said Francis D. Dungan." It was also expressly stipulated that in the event of non-payment of any premium on the day named for its payment, the policy, with all previous payments thereon, and also all interest in profits, should be forfeited to the company. This policy appears to have been issued upon the cancellation of a policy issued by the defendants in 1852, on the life of Francis D. Dungan, for the benefit of a former wife, for $5,000, and which policy was kept alive by the regular payment of premiums until it was cancelled, and the policy of the 17th of June, 1861, substituted in its stead. At the time of issuing this latter policy William P. Webb was the agent of the defendants in Baltimore, and through whom the policy was obtained. For the purpose of paying the cash part of the premium due on the 17th of June, 1862, Webb, the agent, loaned Dungan and wife the money, and took their note at four months, for $220.25. The cash part of the premium was then paid, and a note given for the residue; and this was the last premium that was ever paid by either Dungan or his wife. Webb, at the time of taking the note for the money loaned, took an assignment of the policy, under the hands and seals of Dungan and his wife, and which assignment is as follows: "For value received, we do hereby assign, transfer and set over unto Wm. P. Webb, his heirs or assigns, the above named policy of insurance, and all sum or sums of money, interest, benefit and advantage whatsover, now due or hereafter to arise, or to be had or made by virtue thereof, to have and to hold unto the said Wm. P. Webb, his heirs or assigns." And at time of the making of this assignment, Webb executed the following receipt and defeasance: "Received of Mrs. E. W. Dungan and Mr. F. D. Dungan, assignment of policy No. 9238, in the Mutual Benefit Life Insurance Company

of N. J., life of F. D. Dungan, *as security for the prompt payment at maturity of their note*, at four months from date, amounting to two hundred and twenty $\frac{25}{100}$ dollars; said assignment to be null and void upon the payment of said note at its maturity, otherwise to continue for sole use of Wm. P. Webb." These papers all bear date the 17th of June, 1862.

The note given to Webb was not paid at maturity, and, indeed, has never been paid, and consequently the policy was not redeemed; and Webb, as assignee, paid the premiums as they fell due in 1863, 1864 and 1865; and on the 28th of November, 1865, he surrendered the policy to the company, for which he received its reserve value, amounting at that time to $1,248.51. Mrs. Dungan, the assured, died in August, 1868, and Mr. Dungan, upon whose life the policy was taken, died in April, 1870. Mrs. Dungan died intestate, and letters of administration upon her estate were not obtained by the plaintiff until December, 1871.

The present application proceeds upon the theory that the assignment and receipt or defeasance before cited, when taken together, constitute a mortgage to secure the payment of the note for $220.25, and that there has been no such foreclosure as to preclude the plaintiff the right to redeem the policy, and, under the peculiar circumstances of the case, to recover the amount of the insurance as if the policy subsisted in full force at the death of Francis D. Dungan; and, accordingly, the plaintiff not only seeks to redeem the policy, but to recover the amount thereof, less the amount of unpaid premiums and interest, due the company, and the amount of the note with interest due Webb, together with the premiums paid by him while he held the policy as assignee. This claim of the plaintiff is controverted by the defendants in all the aspects in which it has been presented; and there has been considerable evidence adduced to show the circumstances of the transac-

tion, and the manner in which the parties concerned dealt with each other in regard to the policy after it was assigned to Webb. This evidence is, in some material particulars, conflicting ; but it gives rise to questions of the want of good faith and fair dealing on the part of Webb and the defendants, in respect to the right of the assured to redeem the policy while held by Webb, and before its surrender to the company.

We have held in the former case that the assignment and the receipt or defeasance are to be taken together as the evidence of the contract between the parties, and the character of that contract is to be determined from the manifest intention of the parties thus evidenced. Any agreement in the assignment, or in the separate instrument, showing that the parties intended the assignment to operate as a security for the repayment of money, is all that is necessary to make it a mortgage, and such an agreement is plainly apparent on the face of the defeasance before recited ; and when it is once ascertained that the assignment is to be considered and treated as a mortgage, then all the consequences appertaining in equity to a mortgage must be strictly observed, and the right of redemption is regarded as an inseparable incident. *Jaques vs. Weeks,* 7 *Watts,* 261. And, as a general proposition, an agreement, at the time of the loan, to purchase or take the estate at a given price, in case of default, is not permitted to interfere with the right of redemption ; the Court looking at the real contract, which is but a security for the debt, treats the time mentioned for redemption as only a formal part of the instrument, and thus makes the general intention override the words of the particular stipulation. *Hipwell vs. Knight,* 1 *Y. & Coll. Ex. Cas.,* 415, 416. Indeed it may be stated as a rule never to be transgressed, that a mortgagor cannot, by any contract entered into with the mortgagee *at the time of the mortgage,* give up his right of redemption, or fetter it in any manner by confin-

ing it to a particular time, or to a particular description of persons. This proposition is abundantly supported by decided cases, which are collected in the notes to the leading case of *Howard vs. Harris*, 3 *Eq. L. Cas.*, 605, 606, and 625, 6–7. It is clear, therefore, that, notwithstanding the express terms of the defeasance, that in default of payment of the note at maturity, the policy was to continue for the sole use of the mortgagee, the right of redemption was not thereby defeated after the day of payment.

Policies of insurance on life, as well as stocks and personal annuities, are not only assignable but proper subjects of mortgage ; and if accompanied by an actual transfer, the mortgagee may, after default and due notice to the mortgagor to redeem, proceed to sell, without the trouble and delay of bringing a bill to foreclose ; and in such case the title, if the sale be *bona fide* made, will vest absolutely in the vendee. *Dyson vs. Morris*, 1 *Hare*, 413, 425 ; *Tucker vs. Wilson*, 1 *P. Wms.*, 261 ; *Hart vs. Ten Eyck*, 2 *John. Ch. R.*, 100 ; 2 *Sto. Eq. Jur.*, sec. 1031. But in case of a mortgage, or assignment of a policy of life insurance as collateral security for a debt, with right of redemption, the assured is not relieved from the obligation to pay the premiums in order to keep the policy alive, according to the requirement of the contract of insurance, unless it be by some arrangement between the company and the mortgagee ; nor is the mortgagee bound, in the absence of some agreement with the mortgagor to that effect, to keep the policy alive and subsisting, by the payment of the premiums as they may accrue due. He may be prompted by his interest to keep the security alive and in an available condition ; but if he pays the premiums while he is the holder of the policy, he pays them on the faith of the policy as a security for reimbursement ; but such payment in no way changes the nature of the security itself,—that is to say, such payment in no manner destroys the right of redemption.

Here the right of redemption is insisted upon, and it is not pretended that the assured was, by any arrangement or agreement, relieved from the payment of the premiums as required by the terms of the policy. Webb did not assume to pay the premiums while holding the policy as mere collateral security. He accepted the assignment simply as security for the payment of the note which matured at four months from its date, and within the time which the policy would subsist by reason of the last premium paid. Upon what principle, then, can the present claim be maintained,—the assured herself having failed to pay the premiums after the 17th of June, 1862, and there being no premiums paid by any one after the 17th of June, 1865.

There seems to be a want of harmony in the authorities as to the real and true nature of the contract of insurance, such as that contained in the policy before us. By some it is maintained, and with great show of reason, that the insured, upon the payment of the first premium, effects an insurance upon the particular life only for one year, or until the next premium day, and purchases a right to continue that insurance from year to year, during the life insured, at the same rate, leaving it optional with the assured whether to renew or continue the policy or not, and thus making the payment of the premiums a condition precedent to any subsequent liability on the part of the insurers. This view of the subject is strongly maintained by the Supreme Court of Connecticut, in the recent case of *Worthington vs. The Charter Oak Life Ins. Co.*, 41 *Conn.*, 372. While on the other hand, a majority of the Supreme Court of the United States have held, in the case of *The New York Life Ins. Co. vs. Statham*, 3 *Otto*, 24, that the contract is an entire contract of assurance for life, subject to discontinuance and forfeiture for non-payment of any of the stipulated premiums, and thus the payment of the premiums is made a condition subsequent. But, according to either view of the subject, it is certainly true that

exactness and promptitude of payment are all-important to the success of the business of life insurance companies. Without promptness in the payment of premiums all the calculations of the company are liable to be deranged and disappointed. This would work detriment and loss not only to the company but to its policy-holders generally; and nothing would more certainly destroy all confidence in the company than an understanding that parties dealing with it were not required to observe with strictness the terms of their contracts. Such strict observance is essential to the very nature of the business, and it is the general understanding that time is of the essence of the contract.

From this view of the requirements of the contract, it is clear that, in order to maintain the position of the plaintiff in this case, it is necessary to show by satisfactory evidence, that the assured, while it is admitted she did not pay the premiums, did that which was equivalent to actual payment; that is to say, that she tendered payment of them as they became due. But in this we think the plaintiff has failed.

The evidence of the tender of the premiums due the 17th of June, 1863, is not in all respects satisfactory; and it is explicitly denied by Webb, the agent. But, conceding the tender to have been then made to Webb, the defendant's agent, as contended by the plaintiff, it becomes immaterial in the present aspect of the case, inasmuch as Webb, as assignee, did, in fact pay the premium, and continued to pay it for the years 1864 and 1865, and thus kept the policy alive, subject to the right of redemption, upon payment of the mortgage debt, and the premiums advanced for the preservation of the security. It is not pretended that there was any tender of the mortgage debt to Webb at that time, or at any subsequent time. Indeed, the witness admits that he did not know at the time that the policy had been assigned to Webb, or

that he had any claim to hold it.   So if the premium then
due had been received from the witness it would only have
relieved Webb from the necessity of advancing the pre-
mium, and not in any manner restored the policy to the
control of the assured.

After young Dungan's interview with Webb in June
1863, there was no further steps taken on the part of the
assured in reference to the policy until September 1865,
when, distrusting the representations of Webb as to what
had been done with the policy, inquiry was made in regard
to the matter at the home office of the defendants.   At
that time the policy was still alive and subsisting, and
would so continue until June 17th, 1866.   And the assured
was so informed by the officers of the defendants.   The
correspondence that ensued, and before the policy was sur-
rendered by Webb, between the attorney of the assured
and the president of the insurance company, had reference
to the claim and demand of Webb,—the defendants at the
time having no interest in the policy other than mere
insurers.   Mr. Grover, the president, by his letter of the
6th of November 1865, informed Mrs. Dungan's attorney
of the claim of Webb, and the terms upon which he,
Webb, was willing to re-transfer the policy.   The presi-
dent did not, in that letter, profess to be acting in the
interest of the company, but only as he was authorized to
speak for Webb as the holder of the policy.   It was not
until December 12th, 1865, that the president of the com-
pany communicated the fact that the policy had been sur-
rendered by Webb; the surrender having been made on
the 28th of November 1865.   In all this correspondence
and negotiation there was no tender or offer to pay either
the amount claimed by Webb, which was excessive, or the
amount actually and fairly due on account of the note,
and money advanced for premiums.   And it was not until
May, 1866, that young Dungan, according to his testi-
mony, went to the office of the defendants in Newark, and

there saw the vice-president of the company, and told him that he, the witness, had come prepared to pay the amount the company had named to the attorneys, and to which the vice-president replied that the policy had been surrendered and was ended. This statement of the witness is contradicted in the testimony of Miller, the vice-president; but conceding it to be true, the witness admits that he had not the money with him, but states that he had made arrangements for it, and would have got it in New York, and then sent it on from Baltimore. What the arrangements were, with what degree of certainty he expected to receive the money, and how and at what time it was to be sent from Baltimore, the witness has not informed us. Now it is hardly necessary to cite authorities to show that this transaction did not amount to a tender. In 2 *Greenleaf's Ev.*, sec. 603, it is laid down as the settled law, supported by many authorities, that "The *production* of the money is *dispensed with*, if the party is ready and willing to pay the sum, and is about to produce it, but is prevented by the creditor's declaring that he will not receive it. But his bare refusal to receive the sum proposed, and demanding more, is not alone sufficient to excuse an actual tender. The money or other thing must be *actually at hand*, and ready to be produced immediately, if it should be accepted; as, for example, if it be in the next room or up stairs; for if it be a mile off, or can be borrowed and produced in five minutes, or, being a bank check, it be not yet actually drawn, it is not sufficient." And in the recent case of *Talty vs. The Freedman's Saving & Trust Co.* in the Supreme Court of the United States, (3 *Otto*, 325,) where the question was fully considered as to what constitutes sufficient tender, in a case of a voucher pledged as collateral security, and which had been transferred by the pledgee, it was held, that a simple offer by the pledgor, unattended with any tender of the amount due, was insufficient; that an offer to pay is not the equivalent for an actual tender.

In this case, after the occasion just mentioned, there was no other attempt to make tender either of premiums or the amount due Webb. And as the punctual payment of the premiums was an essential condition to the life of the policy, and the question whether the policy should be kept in force or allowed to lapse, being entirely at the option of the assured, or her assignee, there is no principle upon which the claim to redeem and enforce the policy, as if in force at the death of the life insured, can be sustained. The company could not be made to bear the risk without consideration. *Want vs. Blunt,* 12 *East,* 183; *Simpson vs. Accidental Death Ins. Co.,* 2 *C. B.* (*N. S.,*) 257; *Pritchard vs. Merchants' & Tradesmen's Mut. Life Ins. Society,* 3 *C. B.* (*N. S.,*) 662.

But, notwithstanding we decide that the present bill cannot be sustained for the redemption and collection of the policy, as if in force, we think that, under the facts and circumstances of this case, there is an equity to which the plaintiff is entitled.

Webb holding the policy as mortgagee, held it subject to the right of redemption, provided the right was exercised within a reasonable time. He could only sell the policy after giving due notice to the assured to redeem, and while we think it was perfectly competent for him to surrender the policy to the company either for its reserve or equitable value, as an advantageous mode of sale and foreclosure, yet it was necessary that notice should have been given to redeem before the surrender took place; and the party purchasing, or the company accepting the surrender, without such notice, would only acquire the interest of the mortgagee, and hold subject to the right of redemption, as the mortgagee held before the sale or surrender.

Now, there is no pretence that any notice was given to redeem before the surrender of the policy. On the contrary, Webb seems to have proceeded as if he were the absolute owner, and in utter disregard of the right of

redemption. Moreover, his misrepresentations made, first to young Dungan, in June 1863, and again to Lipscomb, the attorney, in September, 1865, were well calculated to mislead and deceive the parties. Webb, it is true, denies making the representations sworn to by the two witnesses named ; but they so distinctly corroborate each other in regard to the statements made by Webb, as to what had been done with the policy, that we cannot do otherwise than accept their evidence as reliable. He stated to these witnesses emphatically that the policy had been surrendered and was dead ; that it was out of his control and no longer available ; and that the only way the matter could be fixed was to have a re-examination of Francis D. Dungan for a new policy ; a thing known to all parties to be then impracticable, owing to the declining and feeble state of Mr. Dungan's health. These statements by Webb in regard to the policy were without foundation in fact, for at the time they were made the policy had not been surrendered, but was then in his control, and in full force.

It is contended for the defendants that they should in no manner be affected by Webb's misstatements in regard to the policy before its surrender. But we do not assent to this. Whatever Webb may have done that would create a right or an equity in respect to the policy, as against himself, will, under the circumstances of this case, affect the defendants, who claim to hold under him, and by virtue of his supposed right to surrender the policy. But the defendants took the policy with express notice of the adverse claim of the assured. They knew that the matter was in dispute between Webb and the assured ; and it would appear that it was with a view of aiding and assisting Webb in his contention that the surrender was effected. Webb states in his testimony that he surrendered the policy in obedience to the desire of the company, and the president of the company admits that he made suggestions to Webb, as to the impropriety or impracticability of con-

tinuing the policy for his own benefit, that may have determined him, Webb, to surrender it; and in his letter of the 27th of November 1865, the president offered Webb strong inducements to that course.

In view of these facts, we are compelled to say that there is an apparent want of good faith in the matter. The utmost candor and good faith were required, not less on the part of the company, its officers and agents, than the assured; and not only in the inception of the contract, but in all subsequent dealings in respect to it. The policy is exceedingly questionable that gives sanction to any such dealing as that here disclosed between the insurance company and its agent. At any rate, in such case, all the intendments should be made against the company, and in favor of the assured, who may have been prejudiced by the conduct of the agent, sanctioned and adopted by the company, as in the present instance.

Upon the whole, we think it but just to declare that the right of redemption continued to exist at the time of the surrender of the policy, and that the surrender should be regarded as having been made on the joint account of Webb and the assured, according to their respective interests; that is to say, on account of Webb to the extent of the interest secured by the assignment of the policy, including premiums paid, and on account of Mrs. Dungan, the assured, for the residue of the reserve value which the defendant agreed to allow Webb.

The defences relied on by the defendants, of the bar of the Statute of Limitations, and lapse of time, we think should not prevail. The Statute of Limitations as a positive bar has no application to a case like this; and as to the lapse of time, the circumstances of the case afford full explanation of that. In a case of this nature, under ordinary circumstances, such length of time as has been allowed to elapse in this case, before bill filed, would show such laches as to preclude relief. The principle of the case of *Lockwood vs.*

*Ewer*, 2 *Atk.*, 303, and many other subsequent cases, would apply and be controlling. But each case depends, more or less, upon its own special circumstances; and here Mrs. Dungan was a *féme covert* from the date of the policy to the time of her death in 1868, and Mr. Dungan, her husband, was, for several years immediately preceding his death in 1870, utterly unable to attend to business by reason of his mental condition. There has been, however, no acquiescence in the claim of either Webb or the defendant in respect to the policy; for in 1866 an action of trover was brought by Dungan and wife against the defendant for the alleged tortious conversion of the policy, and that action was not finally determined until 1873. And although that action was misconceived, yet it was notice to the defendant of the adverse claim of the assured, and there is nothing in the case to show that the defendant has been in any manner prejudiced by the delay.

We shall reverse the decree appealed from and remand the cause, that an account may be taken, if necessary, upon the principle that the defendants are to be charged with the reserve value of the policy at the time of its surrender, that is to say, $1248.51, and be credited with the amount due Webb at the time of the surrender on account of the note, and premiums advanced, with interest to that date; the balance, with interest, to be decreed to the plaintiff, with costs.

*Decree reversed, and
cause remanded.*

(Decided 8th May, 1877.)